IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

PERRY E. BLAKE,
     Plaintiff,

v.                                       Civil Action No. 2:08cv92
                                       (Judge Robert E. Maxwell)

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,
     Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying

his claim for Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the

Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on

cross motions for summary judgment and has been referred to the undersigned United States

Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28

U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

### I. Procedural History

Perry E. Blake ("Plaintiff") originally filed his application for DIB on September 13, 2005,

alleging disability as of October 17, 2003, due to back problems, depression, and learning problems

(R. 75). The application was denied initially and on reconsideration. Plaintiff requested an

administrative hearing, which Administrative Law Judge ("ALJ") Norma Cannon held on July 23,

2007. Plaintiff, represented by counsel, testified, along with Vocational Expert Larry Bell ("VE").

ALJ Cannon issued an unfavorable decision on November 20, 2007 (R. 35). The Appeals Council

denied Plaintiff's request for review on May 29, 2008, making the ALJ's decision the final decision

of the Commissioner (R. 10).

## II. Statement of Facts

Perry E. Blake ("Plaintiff") was born on April 22, 1969, and was 38 years old at the time of the Administrative Decision (R. 35, 62). He has an 8th grade education, and has been unable to pass the test to obtain his GED. He has past work as a delivery driver for a furniture and appliance shop and as a tire man for the same shop (R. 87, 102).

Plaintiff reported that on October 17, 2003, he was performing his usual job as an appliance delivery person, delivering a refrigerator to a home, when he fell off a set of stairs, falling between 15-20 feet into a creek bed (R. 142). He landed on his back on the rocks at the bottom of the creek bed in about an inch or two of water. He also reported striking the back of his head on a cast iron pipe as he fell.

That same day, Plaintiff had x-rays of the right shoulder, cervical spine, thoracic spine, and lumbar spine (R. 138-140). There was no evidence of an acute fracture or dislocation of the right shoulder; and no gross fracture or dislocation of the cervical spine, thoracic spine or lumbosacral spine. There were, however, degenerative changes of the thoracic and lumbosacral spine.

Plaintiff also underwent an x-ray of the left ankle which indicated no evidence of acute fracture or dislocation (R. 137).

On November 3, 2003, Plaintiff underwent an MRI of the lumbar spine which showed loss of vertebral body height at L1 and bone marrow signal changes consistent with bone marrow edema most likely representing a vertebral body compression fracture at L1. Consideration of correlation with bone densitometry for evaluation of osteoporosis or osteopenia was suggested. The doctor concluded there were degenerative changes with intervertebral disc desiccation and narrowing at L4-5 and L5-S1; and posterior disc bulge at L4-5, "which along with a congenitally narrowed spinal

2

canal is producing mild spinal canal and neural foraminal narrowing" (R. 136-136).

On November 21, 2003, Plaintiff underwent an evaluation of the spine by Dr. Charles Werntz (R. 142). Plaintiff complained of ongoing pain in the dorsum of his left foot due to a fractured proximal phalanx of the fourth toe; pain in his back from the sacrum through the occiput with right shoulder pain which increased with activity and with limited range of motion; and some symptoms of leg numbness in his posterior thigh bilaterally. Plaintiff was currently taking up to four hydrocodone tablets per day.

Upon examination, Plaintiff was 5'9" tall and weighed 278 pounds (R. 143). Examination of the back revealed tenderness to palpation from about T12 through L4 and increased sensitivity in the paraspinal musculature in that same range. Because of Plaintiff's size, it was difficult to assess for frank muscle spasm. The lower extremities had normal strength with hip flexion, extension, abduction, knee flexion and extension, ankle dorsiflexion, and plantar flexion bilaterally, except for some breakaway pain in dorsiflexion of his left foot due to the broken bone in that foot.

Plaintiff had normal strength at abduction of the shoulder, flexion and extension at the elbow and hand grip. His hand grip was somewhat weak in the flexed position at the left elbow, but at extension position it was normal. The right shoulder was nontender to palpation over the subacromial bursa, but was markedly tender over the area of the right AC joint. Range of motion of the shoulder was abduction to about 110 degrees, flexion only to about 85 degrees, and extension to about 30 degrees. Sensation to light touch was equal and normal in his bilateral lower and upper extremities. He did have "a positive beer can test of his right shoulder," for rotator cuff tear, with pain referring to the anterior aspect of the shoulder in the area of the AC joint. The doctor reviewed Plaintiff's x-rays and MRI and agreed there was a very mild disk bulge, but opined the

foraminal spaces were essentially open and there was only very mild encroachment on the spinal canal or the foraminal openings caused by the disk bulge.

Dr. Werntz assessed lumbar strain/sprain with concomitant compression fracture of L1; shoulder dysfunction with suspicion of AC joint separation, but possibility of rotator cuff tear; and fracture of the fourth toe, resolving spontaneously (R. 144). Dr. Werntz recommended x-rays and possible MRI of the right shoulder. He concluded that, while Plaintiff did have a compression fracture of L1, he also had "a significant musculoskeletal component of the discomfort in his back." He therefore recommended physical therapy, and suggested Plaintiff increase activity, such as walking, on his own. Dr. Werntz also noted that Plaintiff had a degree of degenerative arthritis, but none that would make him a surgical candidate. He opined that with time and increased activity, Plaintiff would have a marked decrease in his symptoms related to the compression fracture. As his back improved, however, he may have more leg symptoms, which may need intervention.

Dr. Werntz discussed activities with Plaintiff, in particular that he should not drive until about 6 hours after his last dose of hydrocodone. The doctor discussed that Plaintiff's work was fairly heavy and physically demanding, but that he might be able to return to work after a course of physical therapy and work hardening or work conditioning.

A subsequent shoulder x-ray did not reveal evidence of an AC separation, so the doctor referred Plaintiff for an MRI of the shoulder (R. 145). There was indication of slight narrowing and early hypertrophic changes at the left AC joint indicative of slight degenerative joint disease.

On December 6, 2003, Plaintiff underwent an MRI of the shoulder which showed no evidence of rotator cuff teat, but did show considerable arthritic change of the AC joint (R. 151).

A January 20, 2004, MRI of the lumbar spine revealed normal alignment with mild loss of

height of L1 with some high signal in the body on T1 and T2 which may be a hemangioma. At L4-5 there was disc degeneration. At L4-5 there was central dish herniations. There was no evidence of significant canal stenosis, no paraspinal masses, and no evidence to suggest neural foraminal narrowing.

A lumbar myelogram on March 9, 2004, indicated a small central posterior disc protrusion at L4-5, resulting in mild AP diameter canal stenosis (R. 148).

Plaintiff was seen by neurosurgeon James D. Weinstein, M.D. on February 23, 2004 (R. 173). Upon examination, Dr. Weinstein found Plaintiff's reflexes diffusely decreased, but no localization. Straight leg raising was "essentially negative." He opined that the MRI showed disc herniation at 4-5, which may be producing some stenosis. After a CT scan, Dr. Weinstein opined that there was a modest defect at 4-5, mostly on the left, but "enough there to indicate that is a source of his problem." He did not believe it enough to perform surgery, however. He referred to it as a "mild disc bulge." He felt Plaintiff would have trouble in the future, particularly with his heavy-lifting job, and opined that if he could find a job where he did not have to do a lot of lifting, he could get along without the need for surgery.

Plaintiff underwent a lumbar myelogram on March 9, 2004, which showed a small central posterior disc protrusion at L4-5, resulting in mild AP diameter canal stenosis. An MRI of the lumbar spine showed normal alignment with mild loss of height of L1 with some high signal at T1 and 2 which may be a hemangioma. There was disc degeneration at L4-5 and L5-S1. There was central disc herniation at L4-5. There was no evidence of significant canal stenosis, paraspinal masses, or neural foraminal narrowing.

An MRI of the right shoulder showed no evidence of rotator cuff tear, but considerable

5

arthritic change of the AC joint (R. 351).

On March 11, 2004, Plaintiff underwent an Independent Medical Examination by Jack Koay, M.D., upon referral by the State Workers' Compensation Division (R. 152). Plaintiff first stated that his toe fracture had completely resolved and gave him no problems. Plaintiff said that his right shoulder pain was intermittent, at a level of 4 out of ten. He had no numbness or tingling of the right shoulder. He had intermittent stiffness of the right shoulder especially first thing in the morning. He had no weakness of the right shoulder or arm. Cold and wet weather did not affect him at all. Regarding his back, Plaintiff rated his pain as constant and as an 8 on a scale of 10. He had constant numbness of the right leg and intermittent weakness of the right leg. He had intermittent stiffness of the low back. Cold, wet weather did not affect his back at all. Regarding right hip and leg problems, Plaintiff rated the pain as constant and at an 8 out of 10. He had constant numbness of the right leg, intermittent weakness of the right leg, and stiffness of the right leg, especially first thing in the morning or when sitting in a chair for over an hour.

Plaintiff's current medications were listed as Advil and Tylenol (R. 156). Upon examination, Plaintiff weighed 260 pounds (R. 157). He walked with a slow but normal gait without a limp, using a cane in his right hand. During the two hour interview and examination, Plaintiff was able to get up and move around well in the examination room and was able to get on and off the examination table with minimum difficulty and without any assistance at all. He was able to stand on tiptoes and heels well, but was unable to squat.

Range of motion of the right shoulder was decreased to 120 degrees flexion, 40 degrees extension, 114 degrees abduction, 31 degrees adduction, 70 degrees internal rotation, and 75 degrees eternal rotation (R. 159). Both shoulders were level and there was no instability of the right

shoulder. There was no gross muscle atrophy of the right arm. There was no evidence of injury to the long thoracic nerve and spinal accessory nerve and no winging scapula of the right shoulder.

Dr. Koay diagnosed Plaintiff with a sprain type injury of the lumbar spine and associated with central HNP at L4, 5 level; sprain/contusion type injury of the right hip; contusion of the right leg; history of fracture of the 4th toe, left foot; and sprain type injury of the right shoulder (R. 162). He opined that the left foot was excellent, and that he expected the function of the right shoulder to be good. He believed it was premature to make a prognosis regarding Plaintiff's back at the time, however.

Dr. Koay opined that Plaintiff had reached Maximum Medical Improvement (MMI") MMI regarding his shoulder and no additional special treatment was needed (R. 162). Plaintiff's back, right hip and right leg had not yet reached MMI. Plaintiff was temporarily totally disabled at the moment. His permanent partial impairment rating for his toe was 1%, and for his right shoulder was 6%.

On May 18, 2004, Plaintiff underwent a Functional Capacity Evaluation, performed by physical therapist Kevin Boring (R. 174). The conclusion was that Plaintiff was functioning at the sedentary physical level and would benefit from a 20-visit work conditioning program with a focus on developing his lifting ability, increasing his lumbo-sacral strength and stability, and increasing his overall functional capacity. Mr. Boring believed Plaintiff was an excellent candidate.

Plaintiff underwent a "multidisciplinary occupational rehabilitation evaluation" on June 29, 2004 (R. 200). At the time Plaintiff was taking no prescription medications but had noted no worsening of his pain. His primary complaint was still constant low back pain of variable intensity. This day he rated it as six out of ten, and described it as "moderate." He said the pain was worse in

the morning and with walking for more than ½ hours. Extended sitting and climbing stairs worsened the pain. He got some relief with heat, TENS unit and change of position. He occasional had pins and needles in right leg. The doctor noted Plaintiff was in apparent comfort throughout the evaluation with right leg crossed over left at the ankle.

Plaintiff did not describe any change in his relationship with his wife. He spent most days at home caring for their young child. When he had worked the child had a babysitter. Plaintiff's wife worked outside the home. Plaintiff recognized that in order to return to work he would need to obtain a GED and improve his functional capabilities. His employer had no job for him to return to. Plaintiff said he had never had any outside hobbies or interests, and he and his wife never did much socializing. There was no significant change in their activities due to his injury. He did have somewhat poor eye contact, looking down and away. He had little spontaneous speech. When he spoke it was soft with relatively little detail. His affect was somewhat flattened. There was no evidence of a thought disorder. His sleep was variable. He described his mood as "good." The psychologist diagnosed "rule out pain disorder secondary to medical and psychological factors" (R. 202).

Plaintiff began attending a functional restoration program in August 2004 (R. 203). After three weeks, while reporting increased pain levels, he "continue[d] to be fully compliant with all activities." The therapists were "pleased with his gains in work capability, improving this week from the Light-Medium to Medium physical demand classification." Upon completion of the program, Plaintiff was to begin "job search" under the direction of a vocational rehabilitation specialist.

Plaintiff was taking 800 mg Ibuprofen as needed and continued to use a TENS machine. He was also using Tylenol PM to help address his sleep difficulties, but reported little effect. He

acknowledged that anxiety about pain and family issues likely contributed to his loss of sleep. He had a pain flare-up this week, but continued to participate. He also continued to report pain "hot spots" in his lower extremities, and had begun a trial of Neurontin to address this. He continued to meet all goals in his physical therapy, with progress and improvement in all assessments of his maximum lifting capabilities. He continued general nonmaterial handling activities including sustained overhead tasks, sawhorse cross, sustained standing, and forward flexion. He continued to commute daily between Weston and Morgantown despite some poor weather conditions.

Plaintiff completed the 20-day program, demonstrating work capabilities at the medium level (R. 204). He had no job to return to, however, and was working with a vocational rehabilitation specialist regarding employment options. The therapists found Plaintiff could work at the Medium level, with the ability to lift from waist to shoulder of 35 pounds, overhead lift to 35 pounds, carrying to 50 pounds, and push/pull to 50 pounds. Work simulation included: repetitive lifting and carrying from various heights, repetitive squatting, bending, and reaching, sustained overhead and forward flexion tasks, and stair and ladder climbing. Plaintiff was released to return to work/job search. Plaintiff expressed a desire to return to work, although indicating returning to his old job was not a possibility (R. 207).

On October 15, 2004, Plaintiff underwent an Independent Medical Evaluation, performed by Bill Hennessey, M.D. upon referral from the State Workers' Compensation Division (R. 247). Plaintiff's current medication was listed as Motrin. Plaintiff reported to Dr. Hennessey that he was asymptomatic in regard to his right shoulder, neck, thorax, and left foot. His residual complaints as related to his work injury were limited to his low back and right leg. He complained of both right and left constant lumbosacral pain, rated at 8 on a scale of 10. He also reported some intermittent

9

numbness in his right thigh and some numbness in his right foot. He did not report any leg pain or weakness. The low back pain awakened Plaintiff multiple times at night. It was equally severe sitting or lying down. Physical exertion made it worse, but coughing or sneezing did not.

Upon examination, Plaintiff's right shoulder had excellent and symmetric muscle tone and bulk. Active and passive range of motion was complete in all directions. Impingement sign was negative for any rotator cuff condition. Apprehension sign was negative for any instability. There was no pain or weakness with resisted external rotation or abduction to suggest a rotator cuff condition and no point tenderness to palpation. There was no tenderness or pain to palpation over the AC joint. His strength was normal in all planes of motion in the right shoulder. There was no scapular winging.

Plaintiff's low back showed no outward evidence of trauma. His pelvis was level and he did not have a list. Muscle tone and bulk were normal and symmetric. Lumbosacral spine range of motion was compete in all directions. He did have some pain to palpation in his right and left lumbar paraspinal muscles. Straight leg raising was negative bilaterally.

Dr. Hennessey opined that Plaintiff had a full recovery from his left foot and right shoulder conditions, and opined that he was asymptomatic in those areas with a normal physical examination of those areas. Dr. Hennessey opined that Plaintiff should be limited to full time sedentary or light duty work or part time medium duty work due to his lumbosacral condition. He noted Plaintiff was not receiving any treatment and no treatment was recommended in regard to the work injury conditions. Dr. Hennessey rated Plaintiff's whole person impairment as 5%.

Dr. Hennessy completed a Physical Capacities Checklist, opining that Plaintiff could sit, stand, and walk 8 hours in an 8-hour workday (R. 252). He could occasionally lift and carry up to

50 pounds and frequently lift and carry up to 10 pounds. He could occasionally bend, climb, crawl and twist and frequently kneel, squat, and reach. He could frequently drive a car or small truck and had no restriction on his ability to use a stick shift.

All back ranges of motion were normal (R. 253). He could heel toe walk. Straight leg raising was negative

On November 28, 2005, Plaintiff underwent a Mental Assessment performed by Morgan D. Morgan, M.A., upon referral of the State Disability Determination Service (R. 264). Plaintiff's chief complaint was chronic lower back pain since a back injury in 2003. He reported bouts of dysphoria related to worries over his health problems and paying bills. He often ruminated over his problems. He said he had received Special Education services in school. He did not report a history of significant socialization difficulties. He had difficulty with sleep due to back pain. He reported infrequent crying spells. His energy level varied from day to day. Within the last two years he experienced transient suicidal ideations, but denied any serious intent. He had had no mental treatment history.

Upon mental status examination, Plaintiff was cooperative and compliant, made good eye contact, and was spontaneous. He displayed extroversion. He was fully oriented. His overall mood was mostly cheerful and he occasionally displayed a sense of humor. He did occasionally express a mildly dysphoric mood, and his affect was marginally restricted. His insight was mildly deficient. He judgment was within normal limits. He displayed no signs of suicidal or homicidal ideation. Remote and immediate recall were normal, but recent recall was moderately deficient. His concentration was deemed moderately deficient. He reported transient symptoms of dysphoria, related to worries over his health problems and pain. He reported infrequent crying spells.

The psychologist diagnosed Plaintiff with depressive disorder, NOS, and pain disorder, associated with both psychological factors and a general medical condition. His prognosis was "poor."

On December 18, 2005, Plaintiff underwent an examination upon referral from the State disability determination service (R. 269). He complained mainly of back pain. Upon examination, he had full arm and leg strength. Straight leg raising supine was positive on the right at 30 degrees and on the left at 45 degrees. Seated straight leg raising was "questionably" positive on the right at 45 degrees and on the left at 60 degrees. Shoulder range of motion showed decreased flexion on the right, decreased abduction on the right, but other wise normal. Lumbar spine flexion and extension appeared significantly decreased. There also was "some question that he may not have had a full attempt." The diagnosis was low back pain with possible herniated disks, depression, learning disability and morbid obesity.

A Physical Residual Functional Capacity Assessment was completed on January 12, 2006, by Stephanie Eddy, M.D. (R. 296). She found he could occasionally lift 20 pounds, frequently lift ten pounds, stand/walk at least 2 hours in an 8-hour day, sit about 6 hours in an 8-hour day. He could never climb ladders, ropes or scaffolds, kneel, crouch or crawl, and could only occasionally climb ramps or stairs, or stoop or kneel. There was no limitation in reaching (R. 299). He should avoid concentrated exposure to extreme temperatures and vibration, and moderate exposure to hazards (R. 300).

On February 27, 2006, Plaintiff presented to Mark Valley, M.D. at a pain management clinic (R. 304). Plaintiff complained of severe low back pain, left shoulder pain, and neck pain. Examination showed Plaintiff's cervical range of motion was unrestricted and non-tender. He had

12

a severe left antalgic gait and poor range of motion of the lumbar spine, with palpable tenderness at L4-5, sacroiliac joint, and sciatic notch. His left shoulder showed crepitance with range of motion, and some tenderness, but was intact. His right arm was unremarkable. He had good strength in all extremities. He was diagnosed with a work related injury, herniated disc, lumbar radiculopathy, history of cervicalgia and history of shoulder pain.

On March 7, 2006, Plaintiff presented to Ghazala Kazi, M.D. at Tri-State Occupational Medicine (R. 308). Plaintiff said that physical therapy improved his right shoulder pain, but he continued to have lower back pain. Upon physical examination, Plaintiff walked with a normal, steady gait. He did not require the use of an assistive device. He could walk on heels and toes without difficulty. Lumbar spine flexion and extension was decreased. Straight leg raising was 70 degrees sitting and 50 degrees supine bilaterally. Dr. Kazi diagnosed lower back pain (R. 310). He also opined that Plaintiff had not yet reached maximum medical improvement regarding his back and therefore gave him no rating for that impairment. He opined, however, that Plaintiff "should be sent back to work with lifting restrictions of 20 pounds or less and no prolonged sitting or standing and no repetitive bending or stooping."

On March 24, 2006, Plaintiff's treating physician, Dr. Robert Snuffer, D.O., wrote a "To Whom it May Concern" letter, stating that Plaintiff had been his patient since October 2005 (R. 312). Dr. Snuffer wrote that he did  not believe Plaintiff was going to improve much, and was still in considerable pain. He noted that Plaintiff was found to have some learning disabilities which made it difficult to retrain him to a new job. He did opine, however, that he might be able to do some type of job which was sedentary although he couldn't sit very long and would have to be able to get up and move around. He did not know if he could successfully complete training with his learning

disabilities.

On March 30, 2006, Plaintiff presented to Dr. Snuffer for his back pain (R. 342). He took ms contin twice a day for three days and did well. He was now taking one a day and only felt "about half." On examination he had low back pain and spasm with spine tenderness on the left. The assessment was low back pain, depression and herniated disc syndrome.

In April 2006, Plaintiff twisted his left ankle (R. 320). X-rays showed soft tissue swelling with no evidence of acute fracture. Dr. John Galey, M.D. later reviewed the x-rays and found he had an undisplaced fracture and partial tear of the lateral collateral ligaments. About a month later, Plaintiff still complained his ankle was "pretty sore" on both sides. Dr. Galey opined that Plaintiff could weight bear as tolerated, gradually weaning himself out of his cast boot over the next couple of weeks.

On April 28, 2006, Plaintiff complained to Dr. Snuffer about back pain that was "nearly as bad as before" (R. 343). He also complained of depressed mood and being "just overwhelmed by his situation." Dr. Snuffer diagnosed herniated disc syndrom and depression.

On May 16, 2006, Plaintiff presented to Dr. Snuffer, stating that the Ms Contin was controlling his pain and Celebrex was also helping some. He was diagnosed with low back pain, depression NOS, and herniated disc syndrome.

On June 28, 2006, State agency reviewing psychologist Joseph Kuzniar completed a Psychiatric Review Technique, opining Plaintiff had a depressive disorder and pain disorder associated with psychological factors and general medical condition. He would have mild restriction of activities of daily living and mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration persistence or pace. He had no episodes of decompensation

(R. 334). Dr. Kuzniar determined that Plaintiff had less than average intelligence and academic functioning, but this did not preclude meaningful learning in a work training program (R. 336). Dr. Kuzniar expressly stated that Plaintiff's applying for disability was not a good idea based on his capacity to learn new information.

Dr. Kuzniar completed a Mental Residual Functional Capacity Assessment finding Plaintiff was moderately limited in his ability to maintain concentration and attention for extended periods and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Otherwise he had either no limitations or no significant limitation in any category. He concluded that Plaintiff could understand, remember, and carry out at least 1-3 step routine instructions within a low to moderate social interaction demand work setting (R. 340).

On June 29, 2006, Plaintiff presented to Dr. Snuffer for refills of his medication (R. 346). Upon examination, Dr. Snuffer found Plaintiff had chronic lower back pain and bilateral pitting edema. He assessed low back pain.

An MRI on July 1, 2006, showed an old L1 compression fracture; L4-5 central disc herniation and diffuse disk bulge associated with canal and left foraminal stenosis; and L5-S1 central disc protrusion which abutted the left S1 nerve root.

On August 29, 2006, Dr. Snuffer saw Plaintiff for his back pain and medication refill (R. 372). Plaintiff said the Ms Contin was wearing off in about 9-10 hours. Dr. Snuffer diagnosed low back pain.

On September 5, 2006, State agency reviewing physician Cynthia Osborne, DO, completed a Physical Residual Functional Capacity Assessment of Plaintiff finding he could occasionally lift

20 pounds, frequently lift 10 pounds, stand/walk about 6 hours in an 8-hour day, and sit about 6 hours in an 8-hour workday. He could never climb ladders, ropes or scaffolds, and could only occasionally perform all other postural maneuvers (R. 366). He had no manipulative limitations, including reaching in all directions, including overhead. He should avoid concentrated exposure to extreme cold, wetness, vibration, hazards, and fumes, etc. Dr. Osborne found Plaintiff's complaints partially credible and decreased his RFC to light with the additional limitations indicated above.

On September 28, 2006, Dr. Snuffer saw Plaintiff, who complained of chronic low back pain with intermittent spasms or pain in the coccyx (R. 373). He diagnosed low back pain and herniated disc syndrome.

On October 26, 2006, Plaintiff presented to Dr. Snuffer with complaints of back pain and itching rash of the legs (R. 375). Upon examination, the doctor found a spot on the thoracic spine area that felt like a fatty tumor but may have been a tight fascia or scar. Plaintiff had multiple round, dry skin areas on his legs. Dr. Snuffer diagnosed herniated disc syndrome, low back pain, dermatitis, and lipoma of skin and subcutaneous tissue.

On November 10, 2006, Plaintiff presented to Dr. Snuffer's office for blood work (R. 427). The diagnosis was lipoma of skin and subcutaneous tissue.

On November 30, 2006, Plaintiff presented to Dr. Snuffer for a follow-up of his back (R. 426). He was diagnosed with herniated disc syndrome, low back pain and muscle spasm, and was continued on Ms Contin.

On December 21, 2006, Plaintiff presented to the pain clinic for complaints of low back pain shooting down his left leg, and pain in the coccyx (R. 413). A nerve study was conducted to rule out

radiculopathy and polyneuropathy. The study was normal and not supportive of polyneuropathy, myopathy, or radiculopathy on either side (R. 416).

On December 27, 2006, Plaintiff presented to Dr. Snuffer for follow up of his back (R. 424). Plaintiff had had a shot for his back, but said it did not work. He reported tingling, numbness and radicular symptoms in his legs. The diagnosis was low back pain and herniated disc syndrome.

On February 15, 2007, Plaintiff presented to Dr. Snuffer for medication refills and follow up of his back (R. 423). He complained that the pain was worse since having his shots. He was diagnosed with low back pain and herniated disc syndrome.

On March 15, 2007, Plaintiff followed up with Dr. Snuffer for refills of medications (R. 421). He continued to have back pain, no better with Lyrica. His lumbar spine was very tender at the right L5-S1 joint. He was diagnosed with herniated disc syndrome and low back pain.

Plaintiff presented to Dr. Snuffer for follow up of his back pain on April 19, 2007 (R. 419). Upon examination, he lumbosacral spine was still tender. He was diagnosed with piriformis syndrome, low back pain, herniated disc syndrome, somatic dysfunction of the lumbar region, and depression, NOS.

On June 13, 2007, Plaintiff followed up with Dr. Snuffer for refills of his medications (R. 417). His left heel was very sore. His lumbosacral spine was very tender to palpation. The diagnosis was low back pain, herniated disc syndrome and hypertension.

On July 23, 2007, Dr. Snuffer completed a Questionnaire, stating he had treated Plaintiff for about the past two years (R. 428). He opined that Plaintiff would not be capable of work at any but the sedentary level, with walking and standing occasionally, lifting no more than 10 pounds, and sitting most of the time. He could stand for 15 - 30 minutes at a time and walk 30 minutes at a time.

He could be on his feet a total of 2 hours in an 8-hour workday. He must alternate positions frequently. He could never perform any climbing, balancing, stooping, kneeling, crouching, crawling, stretching, reaching, or squatting. He did not need to avoid any hazards except jarring or vibrations. It was not advisable or necessary for him to recline or lie down during the day. It would be advisable or necessary for him to have frequent rest periods sitting. He would be expected to experience chronic pain at the moderate to severe level and intermittent severe pain. He needed a cane occasionally but no other assistive aids. Obesity contributed to his impairment, because "his belly creates increased strain on lumbar spine." He must alternate positions frequently due to pain. He did not need to elevate his feet. He could use his hands for grasping, arm controls and fine manipulation, even on a repetitive basis. Dr. Snuffer then opined that Plaintiff could not perform any full time job due to chronic pain and decreased endurance. When asked if Plaintiff had any mental impairment that in combination resulted in a greater degree of disability than either the physical or mental impairment alone would indicate, he noted that Plaintiff had a learning disability. He did not mention a pain disorder.

On June 19, 2007, psychologist Sharon Joseph evaluated Plaintiff upon referral of his counsel (R. 400). She found his IQ was in the borderline range. He read, spelled and performed arithmetic at the third grade level. Testing suggested he had some moderate deficits in attention and mild memory impairment. Regarding validity, she found Plaintiff put forth fair, but not optimal effort. He appeared to have difficulties with concentration and she believed it was "possible" that his medications or depressive symptoms and pain may have contributed to what may not have been optimal effort. She noted his IQ results were not consistent with his results in 2005, when his results were 9 points higher and grade levels were "much higher." "The results have limitations in terms

of both internal and external validity." On the Beck self-report Depression Inventory, Plaintiff's score fell into the severely depressed range. Personality testing was considered valid, and indicated a high degree of stress, but may have shown some exaggeration of symptoms.

Upon mental status exam, Plaintiff was alert, fully oriented, and cooperative. He was neatly dressed. His mood was anxious and depressed with some brief tearing during the interview. He reported worrying frequently about everything, such as the welfare of his wife and children. He checked the stove multiple times to make sure it was turned off. These were reported as some mild checking compulsions related to anxiety and worry. His motor activity was nervous, posture appropriate, and eye contact average. Language was average. His affect was anxious and insight adequate. His concentration was considered to be moderately impaired. Remote and immediate memory were normal, but recent memory appeared markedly impaired. Dr. Joseph diagnosed major depression, recurrent, moderate; anxiety disorder, NOS; pain disorder with both physical and psychological components; and rule out learning disability.

Dr. Joseph opined the major depressive symptoms appeared to have developed since the 2004 psychological evaluation.

On July 6, 2007, psychologist Joseph completed a mental assessment form, finding Plaintiff would have a marked limitation of his abilities to understand and remember detailed instruction and to complete a normal workday and workweek without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks (R. 381). He would have moderate limitations on his ability to understand, remember and carry out short simple instructions; carry out detailed instructions; exercise judgment or make simple work-related decisions; sustain attention and concentration for extended periods; maintain regular attendance and

19

punctuality; work in coordination with others without being unduly distracted by them; work in coordination with others without unduly distracting them; demonstrate reliability; relate predictably in social situations in the workplace without exhibiting behavioral extremes; respond to changes in the work setting; be aware of normal hazards and take appropriate precautions; carry out an ordinary work routine without special supervision; set realistic goals and make plans independently of others; travel independently in unfamiliar places; and tolerate ordinary work stress. All other activities would be mildly limited.

Dr. Joseph also completed a PRT in which she opined Plaintiff had a depressive syndrome, anxiety disorder, and somatoform disorder (pain disorder with both physical and psychological component. Dr. Joseph also opined that Plaintiff would have a moderate restriction of activities of daily living, moderate difficulties in maintaining concentration, persistence or pace, and moderate difficulties maintaining social functioning (R. 396).

At the Administrative Hearing held on July 23, 2007, Plaintiff testified that he had some arthritis in his right shoulder (R. 468). He did not use that arm very much, and still had difficulty with it. He testified that at times it got stiff and hurt-- ached-- in particular when the weather was bad and cold (R. 468). He testified that his weight did not make it more difficult for him to get around and tolerate his back pain (R. 472). He also testified that he recalled on the day he took the psychological tests with Dr. Joseph (which results were significantly lower) he was having a severe backache, at a level nine (R. 473).

At the conclusion of the questioning, counsel asked Plaintiff if there was anything else he thought would be important for the judge to know about his ability to work, and Plaintiff replied, "Not that I can think of, no."

The ALJ then asked the VE to testify as to whether any jobs would be available to an individual of Defendant's age and educational and work background at the light or sedentary exertional level with a sit/stand option every 30 minutes; occasional posturals, but no climbing ropes, ladders, or scaffolds, no kneeling and no crawling; and avoiding vibrations and extremes of cold; avoiding hazards such as dangerous moving machinery and unprotected heights; avoiding dust, fumes, odors, and gases, wetness, and humidity. The individual would need an entry-level job, unskilled, with simple instructions, simple tasks, and repetitive work with limited decision making and limited contact with the public (R. 479). The VE testified that he could work as a machine tender or grader/sorter. If he needed to change position more often, he could work at the sedentary level as a sedentary general sorter and sedentary machine tender. Use of a cane to ambulate to the restroom, for instance, but not affecting work would not impact the jobs available. If he could not bend, crouch or stoop at all the light jobs would be eliminated.

Upon cross examination, the VE testified if the person could only stand/walk two hours in an eight-hour workday, he would be limited to sedentary work. If he needed frequent rest breaks more than ten percent of the day, there would be no jobs. If he could never climb, balance, stoop bend, kneel, crouch, crawl, stretch, reach or squat, there would be no jobs (R. 485).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520, the ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2.  The claimant has not engaged in substantial gainful activity since October 17, 2003, the alleged onset date (20 CFR §§ 404.1520(b) and 404.1571 *et*

*seq.*)

3.    The claimant has the following severe impairments: status post left toe fracture to the proximal phalanx, minimal compression fracture at L1 and with bulging to small herniated nucleus pulposes at L4-5 (Exhibit 8F, Page 14), lumbosacral strain/sprain, right shoulder strain with arthritis, obesity and anxiety and a pain disorder, and possible mild learning disability vs. borderline intellectual functioning (20 CFR §§ 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §§ 404.1520(d), 404.1525, and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work with the ability to sit or stand about every 15 to 30 minutes; with no more than occasional postural movements except no kneeling or crawling and no climbing of ropes, ladders or scaffolds; with avoidance of dusts, fumes, wetness, gases and humidity; and with entry level work with simple tasks of a routine and repetitive nature; with limited decision making; and limited contact with the public (SSR 96-5p).

6.    The claimant is unable to perform any past relevant work (20 CFR § 404.1565).

7.    The claimant was born on April 22, 1969, and was 34 years old, which is defined as a "younger individual" age 18-49, on the alleged disability onset date (20 CFR §§ 404.1563 ).

8.    The claimant has a limited education and is able to communicate in English (20 CFR §§ 404.1564).

9.    Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10.    Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR §§ 404.1560(c), 404.1566).

11.    The claimant has not been under a "disability" as defined in the Social Security Act, from October 17, 2003, through the date of this decision (20 CFR §§ 404.1520(g)).

(R. 21-35).

## IV. DISCUSSION
### A. Contentions of the Parties

Plaintiff contends:

1.      The ALJ found a severe impairment of right shoulder strain with arthritis, but included no limitations in reaching in her hypothetical RFC question to the Vocational Expert.

2.      The ALJ relied upon jobs named by the Vocational Expert which did not conform to the ALJ's hypothetical question.

3.      The ALJ relied upon jobs that required frequent or constant reaching inconsistent with the right shoulder arthritis, the opinion of the treating physician, objective findings of limitation of motion, and the testimony of the claimant, as set forth in Argument I.

4.      The ALJ's analysis of credibility at step two of the credibility analysis is insufficient and omits much evidence favorable to the plaintiff.

The Commissioner contends:

1.      The ALJ properly accommodated Plaintiff's shoulder strain with arthritis impairment in his residual functional capacity assessment.

2.      The ALJ properly relied on the impartial testimony of a Vocational Expert.

3.      The ALJ properly evaluated Plaintiff's credibility.

### B. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345

(4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## C. Right Shoulder Impairment and Reaching

Plaintiff first argues the ALJ found a severe impairment of right shoulder strain with arthritis, but included no limitations in reaching in her hypothetical RFC question to the Vocational Expert. Defendant contends the ALJ properly accommodated Plaintiff's shoulder strain with arthritis impairment in his residual functional capacity assessment. In Koonce v. Apfel, 166 F.3d 1209 (4th Cir 1999), the Court held that an ALJ has "great latitude in posing hypothetical questions" and need only include limitations that are supported by substantial evidence in the record.

Plaintiff is correct in that the ALJ did find that he had a severe impairment of "right shoulder strain with arthritis;" however, a finding that an impairment is "severe" in a Social Security context does not mean the same as it does in layman's terms. In fact, "'an impairment can be considered as "not severe" only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age,

education, or work experience.'" Evans v. Heckler, 734 F.2d 1012 (4th cir. 1981)(citing Brady v. Heckler, 724 F.2d914 (11th Cir. 1984)).

In this case the ALJ noted that in 2003, Plaintiff complained of shoulder discomfort, and had evidence of arthritis in the shoulder, but no rotator cuff tear. Dr. Koay's examination indicated Plaintiff's shoulders were fine, although he allowed a 7% whole body impairment due to the toe fracture in combination with loss of motion of the right shoulder. In 2004, Dr. Gross reported that Plaintiff demonstrated medium level work ability including overhead, and with reaching. Finally, Dr. Hennessey reported that Plaintiff indicated his shoulder was asymptomatic as of October 2004. In 2006, reviewing physician Dr. Eddy opined that Plaintiff could sustain a range of light work with no limitations on reaching. In February 2006, Plaintiff had an intact left shoulder with some crepitance and tenderness. Significantly, it is his right shoulder about which he complains, but that shoulder was found to be normal. Regarding his shoulders, he was diagnosed only with a "history of" neck and shoulder pain. Again there was no limitation placed on reaching.

The record shows that Plaintiff did indeed have right shoulder pain which increased with activity and with limited range of motion shortly after his injury. Dr. Werntz found his right shoulder was markedly tender over the AC joint and range of motion was decreased. The doctor suspected rotator cuff tear or AC joint separation. He also noted that Plaintiff might be able to return to his "fairly heavy and physical demanding "work after a course of physical therapy and work hardening or conditioning. X-rays ordered by Dr. Werntz did not reveal evidence of AC separation. An MRI showed only slight narrowing and early hypertrophic changes of the left AC joint indicative of slight degenerative joint disease. A subsequent MRI showed considerable arthritic change of the AC joint. In March 2004, orthopedist Dr. Koay indicated that Plaintiff reported his right shoulder

pain was only intermittent, and at a level of 4 out of 10. He had intermittent stiffness of the right shoulder especially first thing in the morning, but no numbness or tingling or weakness. Dr. Koay found Plaintiff's range of motion of the right shoulder was decreased, but there was no instability, no gross muscle atrophy of that arm, no evidence of injury to the long thoracic nerve and no winging scapula on the right shoulder. Dr. Koay diagnosed a "sprain type injury" of the right shoulder, and opined that he expected the function of that shoulder to be good. He also opined Plaintiff had reached MMI regarding the shoulder and no special treatment was needed at the time. He found Plaintiff's impairment rating for the shoulder was 6%.

Plaintiff began attending a functional restoration program in August 2004, including general activities which included sustained overhead tasks. After the 20-day program, he demonstrated work capabilities at the medium level, with the ability to lift from waist to shoulder and to lift overhead up to 35 pounds. His work simulation included reaching as well as sustained overhead and forward flexion tasks.

In October 2004, Plaintiff reported to Dr. Hennessey that his right shoulder, neck, and thorax were asymptomatic. His only residual complaints were limited to his low back and right leg. Upon examination, Plaintiff's right shoulder had excellent and symmetric muscle tone and bulk; complete range of motion in all directions; negative impingement sign; negative instability; no pain or weakness with resisted external rotation or abduction; no tenderness to palpation over the AC joint; and no scapular winging. His strength was normal in all planes of motion in the right shoulder. Dr. Hennessey concluded that Plaintiff had had a full recovery from his right shoulder conditions and opined the shoulder was asymptomatic with a normal physical examination He also found Plaintiff could frequently reach, frequently drive a car or small truck, and had no restriction on using a stick

shift. Fourteen months later, Plaintiff underwent an examination, which showed decreased flexion and abduction of the right shoulder, but was still otherwise normal.

A State agency reviewing physician in 2006, opined Plaintiff had no limitation in reaching. Shortly thereafter, Plaintiff complained of **left** shoulder pain. His left shoulder showed crepitance with range of motion and "some tenderness," but was intact. His **right** arm was unremarkable. He was diagnosed with a "history" of shoulder pain. Later, Plaintiff reported that physical therapy had improved his right shoulder pain. A second State agency reviewing physician found that Plaintiff had no manipulative limitations, including reaching in all directions, including overhead. In 2007, Plaintiff's treating physician, Dr. Snuffer completed a questionnaire, stating that Plaintiff could never perform any stretching or reaching. This opinion, however, is not supported by the record or Dr. Snuffer's own office notes.

An ALJ has "great latitude in posing hypothetical questions" and need only include limitations that are supported by substantial evidence in the record. Koonce v. Apfel, 166 F.3d 1209 (4th Cir 1999). From the evidence of record, the undersigned finds that substantial evidence supports the ALJ's RFC, and his hypothetical to the VE, which did not include limitations on reaching. Although the ALJ found Plaintiff had a severe shoulder impairment of arthritis and a strain type injury, there is little to no evidence that this affected his ability to reach. As to Plaintiff's argument that the ALJ included no limitations due to his shoulder impairment, the undersigned finds the ALJ did include limitations that took into account his impairment, including limiting him to light or sedentary work.

### D. Jobs Identified by Vocational Expert

Plaintiff next argues the ALJ relied upon jobs named by the Vocational Expert which did not

conform to the ALJ's hypothetical question. Defendant contends the ALJ properly relied on the impartial testimony of a Vocational Expert.

Plaintiff correctly states that the ALJ concluded that he could perform light jobs as a machine tender. The VE identified that job as DOT 619.365-010. Plaintiff contends the DOT identifies this as a "medium" exertional level job. Plaintiff next states that the ALJ found he could perform sedentary jobs as a general sorter, a job which the VE identified as DOT 734.687-010. Plaintiff contends this is not a general sorter job, but an assembler job requiring applying acetone cement on buttons. The ALJ opined that Plaintiff should avoid fumes, odors, and gases, and Plaintiff argues that acetone is considered a workplace hazard in New Jersey, Pennsylvania, Massachusetts and New York City, and is also identified as a chemical of concern and worker hazard risk due to inhalation and dermal exposure.

First, the undersigned notes that the ALJ cited "representative" occupations "such as" light work as a machine tender; light work as a grader and sorter; sedentary general sorter; and sedentary machine tender. Therefore the jobs named were not considered all-inclusive. Further, even assuming, *arguendo*, that the machine tender job and general sorter job were outside Plaintiff's RFC, there remained the "representational" jobs of grader and sorter and sedentary machine tender. There are a significant number of just these two representational jobs in the national economy. Although Plaintiff next argues that these two jobs require reaching, as discussed below, the undersigned finds substantial evidence supports the ALJ's determination that Plaintiff had the RFC to perform these jobs.

### E. Jobs Requiring Reaching

Plaintiff next argues the ALJ relied upon jobs that required frequent or constant reaching

inconsistent with the right shoulder arthritis, the opinion of the treating physician, objective findings of limitation of motion, and the testimony of the claimant, as set fort in Argument I. Because the undersigned has already found that substantial evidence supports the ALJ's RFC and hypothetical to the VE which contained no limitations on reaching, substantial evidence also supports the ALJ's reliance on the VE's testimony regarding jobs Plaintiff could perform that required reaching.

## F. Credibility

Plaintiff argues the ALJ's analysis of credibility at step two of the credibility analysis is insufficient and omits much evidence favorable to the plaintiff. Defendant contends the ALJ properly evaluated Plaintiff's credibility. The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)).

The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in Craig v. Chater, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated, See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence,"

including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, supra at 594. There is no dispute that the ALJ performed the proper step-one threshold determination. She found Plaintiff had underlying medically determinable physical or mental impairments that could reasonably be expected to produce his pain or other symptoms. The ALJ was then required to the intensity and persistence of his pain, and the extent to which it affects his ability to work.

The undersigned finds that the ALJ considered all the factors discussed in Craig, including Plaintiff's medical history, the medical signs and laboratory findings, objective medical evidence of pain, Plaintiff's daily activities, specific descriptions of the pain and the treatment he took to alleviate the pain.

After completing the 20-day functional restoration program in 2004, Plaintiff was found to be capable of work at the medium level, and was released to return to work/job search. That same year, Dr. Hennessey found Plaintiff should be limited to full time sedentary or light duty work or part time medium duty work. He noted Plaintiff was not at the time receiving any treatment and none was recommended. Plaintiff was taking only Motrin. State agency reviewing physician Eddy in January 2006, opined that Plaintiff could work at the light exertional level. Examining physician Kazi opined that Plaintiff "should be sent back to work with lifting restriction of 20 pounds or less [light level] and no prolonged sitting or standing and no repetitive bending or stooping." State agency reviewing physician Osborne opined in October 2006, that Plaintiff could work at the light

exertional level. Plaintiff's own treating physician opined that he could work at the sedentary level, although he could not sit for very long and would have to be able to get up and move around. In 2007, his treating physician opined that Plaintiff would be capable of working an 8-hour workday at the sedentary level, with occasional walking and standing, but then inconsistently opined that he could not perform any full time job due to chronic pain and decreased endurance.

The undersigned finds the above represents substantial evidence supporting the ALJ's determination that Plaintiff could work at the light or sedentary exertional level with additional limitations.

Plaintiff for the most part argues that the ALJ does not understand pain disorders, which were diagnosed by two examining psychologists. A pain disorder is a mental impairment, the "essential feature" of which is "pain that is the predominant focus of the clinical presentation and is of sufficient severity to warrant clinical attention. The pain causes significant distress or impairment in social, occupational, or other important areas of functioning. Psychological factors are judged to play a significant role in the onset, severity, exacerbation, or maintenance of the pain. The pain is not intentionally produced or feigned as in factitious disorder or malingering."

The ALJ did find Plaintiff had a severe impairment of a pain disorder. The ALJ also noted, however, that two different examining psychologists had questioned the validity of Plaintiff's psychological examination test results. Psychologist Morgan reviewed the psychological test results from 2004, noting Plaintiff's IQ results were "deemed to be a valid estimate of [his] intellectual functioning, although there were some inconsistencies in the report. The psychologist reported 'in several instances he refused to guess even with encouragement.'" (Emphasis added).

In June 2007, Plaintiff saw psychologist Sharon Joseph upon referral by his attorney. On the

Cognistat test Plaintiff scored at the moderately impaired range for attention, constructions, and calculations. He scored as mildly impaired in memory. He scored as average in every other cognitive area. Significantly, as noted by the ALJ, Dr. Joseph found Plaintiff "appeared to put forth fair, <u>but not optimal effort</u>." (Emphasis added) She did opine that it was "possible" Plaintiff's medications, depressive symptoms and/or pain level contributed to "<u>what may not have been optimal effort</u>." (Emphasis added). Dr. Joseph also noted that Plaintiff's IQ test results "do not appear to be consistent, however, with previous psychological testing done in 2005 where Full Scale IQ was 9 points higher, and grade levels in reading, spelling, and math were much higher than current ones. <u>The results have limitations in terms of both internal and external validity</u>." (Emphasis added).

Further, personality testing profile validity "indicated that the patient endorsed a number of psychological problems suggesting that he is experiencing a high degree of stress. Although the MMPI-2 clinical scale profile is probable [sic] valid, <u>it may show some exaggeration of symptoms</u>." (Emphasis added).

In another opinion that Plaintiff may not have been putting forth optimal effort, during a physical examination in 2005, the doctor opined that there was "some question that he may have not had a full attempt."

Additionally, regarding Plaintiff's mental impairments, Dr. Snuffer opined Plaintiff could work at the sedentary level but did not know if he could successfully complete training "with his learning disabilities." As the ALJ noted, Dr. Snuffer is not a mental health professional. Further, Dr. Joseph, a psychologist to whom Plaintiff was sent by his attorney, expressly stated: " I am unable to find documentation of learning disability." State agency reviewing psychologist Dr. Kuzniar noted Plaintiff's pain syndrome and opined Plaintiff had less than average intelligence and academic functioning but then specifically found this did not preclude meaningful learning in a work training

program and expressly stated that Plaintiff's applying for disability was not a good idea. He opined Plaintiff could understand, remember, and carry out at least 1-3 step routine instructions within a low to moderate social interactive work setting. Where asked if there was a mental impairment that caused a "functional overlay," Dr. Snuffer mentioned only a learning disability, not a pain disorder.

Regarding the other limitations found by the psychologists, in 2004, Plaintiff reported during a psychological evaluation that he had never had outside hobbies or interests and that he and his wife had never done any significant socializing. There was no significant change in social or recreational activities because of his injury. His wife "continued" to do all of the housekeeping. A typical day for Plaintiff was spent at home caring for the couple's four-year-old son. Plaintiff and his wife also denied any significant change in the quality of their interpersonal relationship. Plaintiff only acknowledged being "a little worried," denying any depressive symptoms. His mood was described as good. His only psychological diagnosis was "rule out pain disorder secondary to medical and psychological factors."

In 2005, Plaintiff reported "transient bouts of dysphoria related to worries over his health problems and paying bills." He did not report a history of significant socialization difficulties. He was not using any prescription pain medications, only Advil and Tylenol. During the examination, Plaintiff was cooperative and compliant; made good eye contact; was spontaneous; displayed extroversion; his mood was mostly cheerful; and he occasionally displayed a sense of humor. He did occasionally express "a mildly dysphoric mood" when describing certain events in his life, and his affect was "marginally" restricted." He, himself, reported only transient symptoms of dysphoria, related to worries over his health problems and pain. He reported arising between 4 and 6 am due to back pain, and taking a nap during the day. He was capable of maintaining his own personal

hygiene. He cooked about twice a week, which took about 45 minutes per meal. He did not perform any household or cleaning tasks (but as noted earlier, his wife had apparently always done those). He said he could work for ten minutes at moderate exertion, but then would need a ten-minute break afterward. He ate at restaurants only occasionally, but this was due to finances, not impairments. He went shopping about once a month for ten minutes at a time, often returning to the car due to back pain. He reported having a small social network (which he had reported was the case before his injuries).

Insight was deemed mildly deficient, judgment normal, immediate recall normal, recent recall moderately deficient, and remote recall normal. Concentration was deemed moderately deficient and he displayed mild motor tension. The psychologist found his concentration, persistence and pace moderately deficient.

Based on these observations, psychologist Morgan diagnosed Plaintiff with Depressive disorder, NOS and Pain disorder, associated with both psychological factors and a general medical condition.

Based in large part on Ms. Morgan's examination, State agency reviewing psychologist Jeff Harlow opined that Plaintiff's restriction of activities of daily living was mild, his difficulties maintaining social functioning was mild, he had moderate difficulties maintaining concentration, persistence or pace, and had no episode of decompensation. He also found Plaintiff's limitations appeared to be generally physical–due to pain. He concluded that Plaintiff could perform repetitive work-related activities.

Further, State agency reviewing psychologist Kuzniar found Plaintiff had a Pain disorder associated with psychological factors and a general medical condition, yet still opined that Plaintiff

not only was not disabled, but that his "applying for SSD is not a good idea based on his capacity to learn new information."

The undersigned finds that the ALJ properly based his credibility finding in part on the psychologists' findings that Plaintiff's test results may have been invalid. Even though Dr. Joseph opined that the invalidity "may have been" due to pain or medications, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). There was substantial evidence in this case to support the ALJ's credibility determination.

Further, the undersigned also finds that the above cited evidence constitutes substantial evidence supporting the ALJ's determination that even though Plaintiff had a severe impairment of pain disorder, he was capable of performing work at the level with the limitations he provided to the VE in his hypothetical.

## V. Recommended Decision

The undersigned finds substantial evidence supports the Commissioner's decision denying the Plaintiff's application for DIB. I accordingly recommend that Defendant's Motion for Summary Judgment [Docket Entry 12] be **GRANTED,** Plaintiff's Motion for Summary Judgment [Docket Entry 9] be **DENIED,** and that this action be **DISMISSED and RETIRED** from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Recommendation for Disposition, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such

objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert. denied</u>, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _14_ day of December, 2009

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE